**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kim ARNOLD, Defendant–Appellant.**

No. 88–2133.

United States Court of Appeals, Sixth Circuit.

Argued July 27, 1989.

Decided Nov. 28, 1989.

John A. Smietanka, U.S. Atty., John C. Bruha (argued), Office of the U.S. Atty., Grand Rapids, Mich., for plaintiff-appellee.

Kenneth R. Sasse (argued), Detroit, Mich., for defendant-appellant.

Before WELLFORD and RYAN, Circuit Judges, and CONTIE, Senior Circuit Judge.

WELLFORD, Circuit Judge.

Kim Arnold appeals his conviction for participation in a large conspiracy to distribute marijuana. In March 1988, a grand jury returned a three-count indictment against Arnold and 16 other defendants. Count 1 charged the defendants with conspiracy to possess with intent to distribute and distribution of in excess of 1,000 pounds of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1). Count 2 charged the defendants with possession with intent to distribute and distribution of in excess

of 1,000 pounds of marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Prior to trial, the district court severed the defendants into two groups for trial. Appellant Arnold was in the second group to be tried, along with several codefendants. His trial began on August 2, 1988, and ended on August 26, 1988. At the conclusion of trial, Arnold was found guilty of Counts 1 and 2 as charged. He was subsequently sentenced to thirteen years in prison on Count 1, ten years in prison on Count 2, the sentences to run concurrently, and was assessed a $20,000 fine.

For the reasons discussed below, we affirm.

## I.

In the Spring of 1983, Dennis Erikson was invited to invest in a large load of marijuana. Erikson began making arrangements to obtain and distribute this marijuana. With Stephen Powell, Erikson arranged to store the marijuana at a house and pole barn on MN Avenue in Galesburg, Michigan, near Kalamazoo. That property was being purchased by appellant Arnold on a land contract and was being rented by codefendant Willis Canter. There is some evidence that the anticipated load of marijuana was discussed in advance with Arnold. For example, a few weeks before the load arrived, Arnold told one of his marijuana customers to "stick around."

In August 1983, a boat load of marijuana arrived at Atlantic City, New Jersey from Colombia, South America. The marijuana was loaded onto a semi-truck and driven to Arnold's property on MN Avenue in Galesburg on approximately August 15, 1983. When the semi pulled into the driveway, it got stuck and nearly tipped over and had to be freed by a tow truck. The semi was then taken to a backup storage site on a farm near Three Rivers, Michigan.

The marijuana was unloaded into a pole barn at the Three Rivers farm. It totalled 43,000 pounds, including packaging. The following day, Erikson and Powell began transporting loads of marijuana to Arnold's property on MN Avenue for distribution by Arnold and codefendant Canter. Erikson testified that approximately 8,000 to 10,000 pounds of marijuana were delivered to that location over a two day period. Two witnesses testified that Arnold was present at that location shortly after the arrival of the marijuana. Jeff Jordan, who was Powell's "bookkeeper" on the load of marijuana, testified that Arnold and Canter were Powell's biggest customers on this load and received at least 2,000 to 3,000 pounds. The marijuana was sold on consignment, and Arnold and Canter had an outstanding balance of up to $1,000,000.

Frederick Schmalfeldt testified that he purchased approximately 6,000 pounds of marijuana from this load from appellant Arnold on consignment. Schmalfeldt obtained marijuana at the MN Avenue location and made payment to Arnold or to Canter there also. The payments continued for several months. One such payment was made by Schmalfeldt's wife, who testified that she made a $30,000 payment to Arnold at MN Avenue sometime before August 22. Schmalfeldt testified that sometime later, at Arnold's request, he delivered several hundred pounds of the marijuana to Alex Zissu on D Avenue near Kalamazoo. Zissu confirmed this testimony and stated that Arnold was present for the delivery. Zissu further testified that he purchased the marijuana from Arnold on consignment and made payments to Arnold on MN Avenue.

Arnold presented an alibi defense at trial. He presented testimony and documentary evidence that he was in Ludington, Michigan—138 miles from Kalamazoo—from August 12 through August 21, 1983 for a boat captain's course and Coast Guard exam, and thus could not have been in the Kalamazoo area when the load of marijuana arrived. John Lewellen testified that he was with Arnold in Ludington the entire time. Lewellen further testified that he had been friends with Arnold since junior high school, saw him several times a year, and lived in the same condominium building on Hilton Head Island where Arnold stayed during the winter. He was unable, however, to state what Arnold's occupation was. The government was al-

lowed to cross-examine Lewellen about prior drug transactions with Arnold on the issue of bias. Lewellen at first took the fifth amendment, but later stated that he had only one small transaction with Arnold about 18 years ago. No alibi was presented as to Arnold's alleged involvement in this conspiracy prior to August 12 or after August 22, 1983.

## II.

### 1. *Cross Examination of Lewellen*

■ The appellant first contends that the district court abused its discretion in ruling that the government was entitled to explore alibi witness Lewellen's prior drug dealings with the defendant on the issue of bias. He argues that even if such evidence was relevant to the issue of bias, its probative value was clearly outweighed by its prejudicial impact under Federal Rule of Evidence 403.

In *United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984), the Supreme Court ruled that evidence as to whether the defendant and the defense witness were members of a secret prison organization that required its members to lie for each other was sufficiently probative of bias to warrant its admission into evidence. The Court noted that the Federal Rules of Evidence do not specifically address impeachment by bias, but stated, "It is permissible to impeach a witness by showing his bias under the Federal Rules of Evidence just as it was permissible to do so before their adoption." *Id.* at 51, 105 S.Ct. at 468. The Court defined bias as "a term used in the common law of evidence to describe the relationship between a party and witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *Id.*

The Supreme Court in *Abel* noted that a "district court is accorded a wide discretion in determining the admissibility of evidence under Federal Rules." *Id.* at 54, 105 S.Ct. 470. Under Rule 403, relevant evidence should be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice. *United States*

*v. Mendez–Ortiz,* 810 F.2d 76, 79 (6th Cir. 1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 697 (1987). The trial court has "very broad discretion in balancing probative value against potential prejudicial impact." *United States v. Ismail,* 756 F.2d 1253, 1259 (6th Cir.1985).

Although it is a very close question and we might have reached a different conclusion, we do not believe the trial court abused its discretion in ruling that the government was entitled to explore prior drug dealings between the witness and the defendant on the issue of bias. It is unlikely that the witness or the defendant was seriously and unfairly prejudiced in the testimony indicating involvement in a minor marijuana transaction 18 years ago, especially considering the government's strong evidence of Arnold's involvement in a 43,-000 pound load of marijuana as alleged in the indictment.

■ The district court instructed the witness that he could assert his fifth amendment right not to testify. It was only after defense counsel challenged the witness' privilege on statute of limitations grounds and expressed a preference that the witness answer the question rather than have the jury speculate about it, that the answer was given. As a matter of trial strategy, therefore, the defense appears to have expressed a preference for the witness answering the questions concerning prior drug dealings. Under all the circumstances, we conclude that even if it were error to admit this evidence, we do not find this action constitutes reversible error.

### 2. *September 19, 1983 Marijuana Transaction*

Appellant Arnold next argues that he was prejudiced by evidence of his involvement in the alleged conspiracy in September 1983. Arnold's chief complaint concerns the testimony of witnesses Zissu and Schmalfeldt. The day after Zissu's testimony regarding Arnold's sales to Zissu on consignment, defense counsel moved to strike the testimony on grounds of unfair surprise. That motion was denied.

■ Arnold contends that he was only on notice that he had to defend against allegations of involvement in August of 1983, and was unfairly prejudiced by evidence of his involvement in September 1983. He bases his claim on the language of the indictment and an alleged lack of notice of Zissu's testimony.

Count one of the indictment alleges that the conspiracy occurred in *or about* August 1983. In *United States v. Lane,* 514 F.2d 22 (9th Cir.1975), a case cited by the appellant, the court rejected an argument that the defendant was unfairly prejudiced by proof of an indictment on July 16, 1973, when the indictment alleged "on or about June 7, 1973." The *Lane* court held that "[t]his was not a fatal variance." *Id.* at 27. We find *Lane* persuasive on this asserted ground of error.

■ The appellant also claims that he was misled in preparing his defense by the government's bill of particulars. Prior to trial, the government was ordered to file a bill of particulars stating "the date upon which each defendant is alleged to have entered the conspiracy charged in the indictment. . . ." The government subsequently filed a bill of particulars stating that "[t]he government does now know when each and every defendant entered the conspiracy alleged in Count one," that the government had information that defendant Arnold and certain other defendants "were involved in the conspiracy prior to the arrival of the semi load of marijuana . . . on or about August 14, 1983." Finally, the bill of particulars stated that defendants were involved in the conspiracy "at least during the distribution phase of the conspiracy, which lasted several weeks."

Although the particulars could have been more specific on the time frame, adequate notice was given to the defendant that the alleged conspiracy continued for some time after August 14, 1983. The district court denied defendant's motion to strike the testimony of Alex Zissu on the additional ground that Arnold was put on notice by reason of a prior trial of Arnold's codefendants that the alleged conspiracy continued into September, as evidenced in that prior trial. Under these circumstances, the appellant does not appear to have been unfairly prejudiced by testimony of his involvement in September 1983.

### 3. *Jencks Act Material*

■ The appellant also claims that he was given "virtually no" Jencks Act material, and was improperly denied production of notes of interviews with government witnesses Jordan and Schmalfeldt. The Jencks Act provides in pertinent part:

§ 3500. Demands for production of statements and reports of witnesses.

. . . .

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. . . .

18 U.S.C. § 3500.

This court in *United States v. Nathan,* 816 F.2d 230 (6th Cir.1987), established a test for determining whether government reports should be produced. *Nathan* holds that a government report of a witness' statement is "producable if the notes from the interview were read back to and verified by the witness *and* if the report summarized the notes without material variation." *Id.* at 237; *see also United States v. Chitwood,* 457 F.2d 676 (6th Cir.), *cert. denied,* 409 U.S. 858, 93 S.Ct. 141, 34 L.Ed.2d 103 (1972). The test set out in *Chitwood* and *Nathan* is known as the "Adoption Test." The relevant issue is whether the witness adopted the government's notes as being substantially verbatim to the statement given. The reasoning behind the rule is that "it would be grossly unfair to allow the defense to use a statement to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations." 816 F.2d at 236.

The trial court appears to have applied this rule correctly. Outside the presence of the jury, the trial court questioned

government witnesses Schmalfeldt and Jordan concerning the notes taken by government agents concerning their statements. The court attempted to determine whether information in the notes in question was "adopted" by the witnesses, as shown by the following colloquy between the court and Jordan:

> THE COURT: Did they ever read you parts of the notes, saying I read here that you said etc., etc.?
>
> THE WITNESS: No, no, Sir.
>
> THE COURT: Do you know what the word adopt means? ... Did you accept their notes as if they were yours? Did you say I am satisfied enough with these notes that they are the same as if I had written them myself?
>
> THE WITNESS: No, sir.

A similar colloquy took place between the court and Schmalfeldt.

Nothing in the record would indicate that the witnesses signed or read the government's notes or had the notes read to them. The trial court therefore correctly ruled that neither witness adopted the government's notes. The trial court's ruling is subject to a clearly erroneous standard. *Chitwood*, 457 F.2d at 678. Under the standards enunciated above, the defendant clearly is not entitled to a new trial on this ground.

### 4. *Guilty Pleas as Substantive Evidence*

■ Arnold's final argument is that the prosecutor argued the guilty pleas of codefendant witnesses as substantive evidence of guilt against this defendant. Although we concede this to be a troublesome issue, we believe the record shows clearly enough that the prosecution's statements concerning the guilty pleas was intended to restore credibility to certain witnesses rather than to present substantive evidence of guilt.

During closing arguments, counsel for the various defendants strongly attacked the credibility of government witnesses, especially Cornelius Plantefaber. For example, counsel for codefendant Ludlow argued that no reasonable person would believe Plantefaber on anything and that Plantefaber was a "master of deception" who lied about everything. Arnold's attorney made similar comments about government witness Alex Zissu and other witnesses. Counsel argued, for example, that Zissu's "whole testimony regarding the involvement of Kim Arnold was nothing but a fabrication." Arnold's counsel also referred to the government witnesses as "liars," "narcotic addicts," and "drug dealers."

The prosecution argued on rebuttal that the government witnesses were credible and stated:

> If there was no merit to what the government witnesses were saying, then why did all these other conspirators who came in and pled guilty do so?

Following objections by the defense lawyers, the prosecutor again stated:

> If there is no merit to the information that Mr. Plantefaber provided and the other witnesses who testified in the grand jury that indicted this case ... why did people like Dennis Erikson plead guilty and admit their involvement in this load of marijuana?

Certainly, these statements by the prosecution are highly suspect and, at least arguably, were intended to present the guilty pleas of other defendants as substantive evidence of Arnold's guilt. Read strictly in context, however, we believe these statements were meant simply to rehabilitate witnesses Plantefaber and Zissu following the defense's attacks on their credibility. The trial judge was in the best position to determine the purpose behind these statements, and he apparently had no doubt that these statements were not being used as substantive evidence of guilt. In view of the circumstances, some deference to the trial judge's ruling is appropriate. In any event, the district court specifically instructed the jury that such pleas were not substantive evidence of guilt. We do not think the prosecutor's statements constitute reversible error.

For the reasons given above, the conviction is AFFIRMED.