81 F.3d 162
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James Thomas SLATER, Defendant-Appellant.
 No. 95-5223.
 United States Court of Appeals, Sixth Circuit.
 March 28, 1996.
 
 Before: MARTIN and JONES, Circuit Judges; and COHN, District Judge.*
 BOYCE F. MARTIN, JR., Circuit Judge.
 
 
 1
 James Thomas Slater appeals his conviction and sentence following a guilty plea to possession with intent to distribute crack cocaine and use of a firearm in relation to a drug trafficking crime. On appeal, Slater argues that the warrantless searches of his vehicle and person were unreasonable and in violation of the Fourth Amendment, and that the evidence seized as a result of those searches should have been suppressed.
 
 I.
 
 2
 Around midnight on November 14, 1993, Officer Alan Gronstrom of the Oak Ridge, Tennessee Police Department pulled Slater over for speeding. Gronstrom believed that Slater's car was the same as or similar to one he had seen before in an area of town known for drug trafficking and violence. After Gronstrom activated his lights and attempted to stop Slater's vehicle at a well-lighted intersection, Slater came to a rolling stop about 200 yards away in an empty and dimly-lit parking lot. Prior to his coming to a complete stop, Gronstrom observed Slater reaching into the rear seat area of his vehicle, although Gronstrom could not see what, if anything, Slater was reaching for.
 
 
 3
 After Slater stopped, Gronstrom approached the vehicle and asked for a driver's license. Gronstrom recognized Slater as someone he had pulled over approximately one year before, without incident, for running a red light. While examining the license, Gronstrom observed Slater reach down between his legs. As Gronstrom shined his flashlight on Slater, Slater quickly pulled both hands up and stated that he did not have anything and was not doing anything. Gronstrom later testified that Slater appeared tense and rigid at the time, and his chest was beating hard. Although Gronstrom was not "deathly afraid," he was somewhat nervous and, consistent with police department policy, retreated to his patrol car to request a back-up officer. Officer Alan Massengill responded to Gronstrom's request within two to three minutes.
 
 
 4
 Upon Massengill's arrival on the scene, Gronstrom returned to the driver's side of Slater's car and Massengill approached the passenger side. Gronstrom asked Slater to step out of the vehicle, and told him that he was going to pat him down for weapons. Gronstrom patted Slater down at the back of his vehicle and discovered no weapons. During the patdown, Slater told the officers that he did not have a gun. Gronstrom proceeded to inform Slater that he was going to look for weapons in the vehicle and turned toward the open driver's door. Slater stated at that point that he did have a weapon in the car. Without entering Slater's vehicle, Gronstrom looked into the passenger compartment through the open door and saw a gun on the driver's floorboard.
 
 
 5
 The officers proceeded to place Slater in custody for the handgun offense and conduct a search of his person incident to his arrest. The search revealed a bag of marijuana, a bag of crack cocaine, a digital pager, and $718.00 in cash. The evidence found during the searches of Slater's vehicle and person led to his conviction on drug and weapon charges.
 
 II.
 
 6
 Slater was indicted on December 7, 1993 for possession with intent to distribute crack cocaine and a firearms violation. On January 4, 1994, he moved to suppress all evidence seized as the result of allegedly invalid searches of his vehicle and person. At the suppression hearing, Slater argued that, after he was pulled over for speeding and an initial pat-down revealed no weapons on his person, it was unlawful for officers to search his vehicle and then his person a second time. The United States, by contrast, argued that the search of Slater's vehicle following the initial patdown of his person was justified either as a permissible extension of Terry v. Ohio, 20 L.Ed.2d 889 (1968), or under the plain view doctrine. The United States further argued that the second search of Slater's person was justified as being incident to his lawful arrest.
 
 
 7
 Following a suppression hearing presided over by a magistrate judge, the district court accepted a report and recommendation that Slater's motion be denied. On June 22, Slater entered a conditional plea to his indictment, reserving the right to appeal the suppression issue. Slater was sentenced to ten years in prison, and this appeal followed.
 
 III.
 
 8
 We review a district court's decision on a motion to suppress "under two complementary standards." United States v. Kennedy, 61 F.3d 494, 497 (6th Cir.1995). The district court's "factual findings made in consideration of a motion to suppress evidence are to be upheld unless they are clearly erroneous [while] the district court's conclusions of law are subject to de novo review on appeal." Id. (citing United States v. Williams, 962 F.2d 1218, 1221 (6th Cir.)). The appellate court reviews the evidence "in the light most likely to support the district court's decision." Id.
 
 
 9
 In his report and recommendation to the district court, the magistrate judge credited the government's presentation of the facts. We hold that those factual findings, adopted by the district judge, were neither clearly erroneous nor contrary to law. We next review the district court's ruling that the police conduct during Slater's stop was reasonable de novo.
 
 
 10
 Police officers may stop a speeding vehicle, approach it for investigation, and ask the driver to step out of the car. Pennsylvania v. Mimms, 54 L.Ed.2d 331, 337 (1977). It is uncontested that Gronstrom had probable cause to believe that a traffic offense had occurred, and lawfully stopped Slater's vehicle after he observed Slater speeding. See United States v. Ferguson, 8 F.3d 385, 391 (6th Cir.1993), cert. denied, 130 L.Ed.2d 47 (1994). Because Gronstrom had a legitimate basis for the traffic stop, it was permissible for him to detain Slater briefly for investigation.
 
 
 11
 When an individual is subject to a lawful investigative detention, an officer may conduct a limited frisk or patdown of that person for weapons if the officer has a reasonable suspicion of criminal activity and a reasonable belief that the suspect is armed and dangerous. Terry, 20 L.Ed.2d at 909. In determining whether an officer's suspicion of danger and subsequent conduct were reasonable, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Id. We hold that, under the circumstances of this stop, Gronstrom was justified in asking Slater to step out of his vehicle and in conducting a limited patdown search for weapons.[1]
 
 
 12
 The rationale of Terry has been extended to permit limited searches of vehicles where an officer has a safety concern based upon an actual suspicion that a weapon is present in a vehicle. Michigan v. Long, 77 L.Ed.2d 1201 (1983) (holding that an officer who has a reasonable and articulable suspicion that an occupant of a vehicle is armed may search the vehicle's passenger compartment to determine whether there is a weapon therein that the occupant could readily access). The "patdown" of a vehicle need not be predicated on the discovery of a weapon on a suspect's person. See United States v. Holifield, 956 F.2d 665, 668-69 (7th Cir.1992).
 
 
 13
 We find that the same factors that justified the initial patdown of Slater, combined with the fact that Slater himself allegedly admitted to the presence of a gun in his vehicle before Gronstrom searched the car, supplied reasonable suspicion that Slater was armed and dangerous and justified Gronstrom's search of Slater's vehicle. The fact that Slater was temporarily under the officers' control behind his car does not detract from the fact that he may have been able to access a weapon in his vehicle readily. Because Slater would have been permitted to reenter his vehicle if he had not been arrested, and would have had immediate access to any weapons inside, it was reasonable for Gronstrom to check Slater's vehicle for weapons even though a patdown revealed none on his person. Long, 77 L.Ed.2d at 1221.
 
 
 14
 Moreover, seizure of the gun from Slater's vehicle was also justified under the plain view doctrine. To seize evidence in plain view without a warrant, an officer must not have violated the Fourth Amendment "in arriving at the place from which the evidence could be plainly viewed." Horton v. California, 110 L.Ed.2d 112, 123 (1990). In addition, the incriminating nature of the evidence must be immediately apparent. Id. After Slater's car was legitimately stopped and Slater was removed from his vehicle for a justified patdown, the car door was left open. Thereafter, both prongs of the plain view test were satisfied when Gronstrom seized the weapon from Slater's vehicle after viewing it from the street through the open car door.
 
 
 15
 Once the gun was seized from the vehicle and Slater was lawfully arrested, both he and his car could be subjected to a complete search incident to arrest for both weapons and evidence. New York v. Belton, 69 L.Ed.2d 768, 773 (1981); Chimel v. California, 23 L.Ed.2d 685, 694 (1969).
 
 
 16
 Because the searches of Slater's person and vehicle were not in violation of the Fourth Amendment, the evidence seized as a result of those searches was properly admitted by the district court. AFFIRMED.
 
 
 17
 NATHANIEL R. JONES, Circuit Judge, dissenting.
 
 
 18
 The majority holds that there was reasonable justification for the police to conduct a warrantless search of Slater's vehicle. I disagree with that holding and also take exception with the majority's application of the plain view doctrine as further support for its position. Therefore, I respectfully dissent.
 
 
 19
 In Michigan v. Long the Supreme Court extended the Terry stop and frisk limits to the warrantless search of an automobile, providing that
 
 
 20
 the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific or articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.
 
 
 21
 463 U.S. 1032, 1049 (1983) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). When making a determination of reasonableness as to a Terry stop, the court must consider the totality of the circumstances. United States v. Cortez, 449 U.S. 411, 417 (1981). "[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety and that of others was in danger." Terry, 392 U.S. at 27. In our review of such a belief, "due weight must be given, not to the inchoate and unparticularized suspicion, or 'hunch,' but to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experiences." Id. Ultimately, to be a valid Terry stop, an officer's reasonable belief of danger must be grounded in "concrete factual circumstances." Id. at 29 (relying on Sibron v. New York, 392 U.S. 40 (1968).
 
 
 22
 Justifying its determination of reasonable suspicion for both the patdown of Slater for weapons and the patdown of his vehicle, the majority combined the following factors with an alleged admission by Slater of the presence of a gun in his vehicle:
 
 
 23
 (1) Gronstrom believed he had seen Slater's vehicle before in an area of town known for drug trafficking and violence; (2) Slater pulled into a desolate parking lot slowly late at night instead of stopping right away in a well-lighted area; (3) Gronstrom observed Slater reaching into the rear seat as he came to a stop; (4) Slater appeared to be nervous and trembling; and (5) while Gronstrom was looking at his license, Slater reached down between his legs and then immediately pulled his hands up saying that he did not have anything and was not doing anything before Gronstrom could even ask about his movements.
 
 
 24
 Maj.Op. at n. 1, [5-6]. In circumstances such as these, a driver's furtive movement of reaching under his seat has been held, in part, to support a finding of reasonable belief of danger. Such a finding, however, has also required concrete facts actually and immediately linking the suspect or the area of the stop to known dangerous activities. See United States v. Malone, 49 F.3d 393, 397 (8th Cir.1995) (holding under seat gesture, combined with knife found in driver's pocket during pat down search and clip of ammunition observed on front seat, supports reasonable suspicion); United States v. Butcher et. al., No. 92-3987; 92-4011, 1993 WL 272450 * 6, 1993 LEXIS 19382 (6th Cir. July 19, 1993) (unpublished per curiam) at * 18 (under seat gesture combined with absolute identification of vehicle as one associated with gunfire within last two hours supports reasonable suspicion); United States v. Evans, 994 F.2d 317, 321 (7th Cir.1993) (under seat gesture combined with location of stop in fron t of reported drug house in high crime area supports reasonable suspicion); United States v. Spenser, 1 F.3d 742, 746 (9th Cir.1992) (under seat gesture combined with officer knowing suspect was previously convicted of assault with deadly weapon, and pat down revealed suspect was wearing empty shoulder holster under jacket supports reasonable suspicion). Contrary to the majority, I do not believe the present combination of circumstances supports a finding of reasonable belief of danger.
 
 
 25
 First, Gronstrom was uncertain whether Slater's vehicle was one he had seen on a prior occasion in an area known for dangerousness. J.A. at 78. More specifically, Gronstrom's confusion over whether Slater's vehicle had tinted windows indicates he may have mistaken this vehicle for another. See J.A. at 79-80, 133. Further, Gronstrom had no explanation for this confusion, finding it sufficiently "puzzling" and "embarrassing" that he sought confirmation about the vehicle from a fellow officer. J.A. at 133. The government recognized the weakness of this "specific and articulable fact" when it characterized Gronstrom's identification of the vehicle as only a "possible association" with the area known for drugs and violence. Government's Brief at 12. Even taken in the light most favorable to the government, this linkage of Slater to possible danger is, in my mind, more a hunch than a specific fact.[1]
 
 
 26
 Second, although nervousness has been considered in finding reasonable belief of wrongdoing in conjunction with other factors, United States v. Mesa, 62 F.3d 159, 162 (6th Cir.1995), I reiterate here that it is an inherently unsuspicious behavior trait. United States v. Saperstein, 723 F.2d 1221, 1228 (6th Cir.1983). Furthermore, in my opinion, a person's level of nervousness is an especially unreliable indicator in the context of a traffic stop. See United States v. Erwin, No. 94-1766, 71 F.3d 218, 221, 1995 LEXIS 34439 (6th Cir. Dec. 8, 1995) at * 6-7 (stating sweating and nervous appearance "is not particularly unusual" for police stop during summer). Contrary to the majority's recitation of factors, I find no indication in the record that Slater was "trembling." See Maj.Op. at , n. 1. Rather, Gronstrom testified Slater's "chest was beating very hard, was very tense and rigid." J.A. at 81. Further, Gronstrom testified that Slater's nervousness lead him to believe that Slater was "more than just nervous about getting a speeding ticket." J.A. at 122. In the wake of explosive publicity and sentiment regarding Rodney King, Mark Fuhrman, et al., it is plausible to me that Slater may have had a heightened concern for his safety, especially after Massengill stealthily arrived "blacked out" just a few minutes after Gronstrom left Slater alone and returned to the patrol vehicle. J.A. at 83.
 
 
 27
 Third, as to Slater's movement as he stopped his vehicle, Gronstrom testified that he could not tell what the driver was reaching for, if anything, stating "[a]ll I saw was movement." J.A. at 80. Opposite to the majority's determination that this movement is a sign of danger, I believe movement occurring at this point in a traffic stop, as drivers reach for the soon-to-be-requested license, vehicle registration, and proof of insurance, should not be unexpected by a reasonably prudent police officer.
 
 
 28
 Fourth, I am troubled by the majority's acceptance of an alleged admission about the presence of a gun in Slater's vehicle when Gronstrom did not include any such statements about a weapon in either of the two incident reports. J.A. at 93-4. To me, an allegation is not a specific and articulable fact. Furthermore, from my reading of the record, Slater's statement about a weapon would have occurred after Gronstrom had already expressed his intent to search the vehicle. J.A. at 92-3. Thus, Gronstrom's decision to search the vehicle was made prior to any statement from Slater and, therefore, the statement would not have affected that decision.
 
 
 29
 Finally, the remaining factors listed by the majority--that is, time of day, location of stop, and manner in which Slater brought his vehicle to a halt--are inherently neutral factors which to me do not imply danger. Thus, in my opinion, the totality of the circumstances may be characterized as a furtive gesture combined with a hunch about a misidentified vehicle, an opinion about an inherently suspect behavior trait, and a reasonably expected movement in a vehicle being pulled over for an apparent traffic violation. Under our Terry jurisprudence, such factors do not add up to a reasonable belief of danger.
 
 
 30
 The inquiry does not end here, though. The police conduct at the scene also raises questions in my mind as to whether these persons acted as reasonably prudent officers with a reasonable belief of danger. Although ostensibly "alarmed" and "cautious" about the driver having immediate access to a weapon, Gronstrom walked right up to the driver door and opened it. J.A. at 124. Moreover, neither Gronstrom nor Massengill had his flashlight shining on Slater when they approached the suspect together; Gronstrom testified that he "had both of his hands free", J.A. at 126, and Massengill testified that he "didn't have any particular occasion to" shine his flashlight on Slater. J.A. at 108. Further, neither officer had a weapon drawn. In hindsight, Gronstrom thought that if he were in Massengill's position, "I may have had my weapon out" but he was "not sure" at the time of the suppression hearing four months after the incident. J.A. at 126. Perhaps most telling though is that Sergeant Gus Paidousis, training officer for the Knoxville, Tennessee Police Department since 1991, testified that under these circumstances, with a back-up officer present, he personally would not have walked up to the vehicle and had Slater step out, that the "preferred method would be to call [Slater] back." J.A. at 138. It is this overall combination of curious conduct and uncertainty about danger which further illustrates a lack of specific and articulable facts in this case.
 
 
 31
 Nevertheless, Gronstrom believed he had a "right" to search the vehicle because "[w]hen we release him and he is back in his vehicle and he sits back in the seat, wherever he can reach we're back in a threat area again." J.A. at 92. The majority relies on this "threat area return" theory as further support for finding a reasonable belief of danger. Maj.Op. at (citing Long, 463 U.S. at 1052). On this point, Professor LaFave argues, and I agree, that except perhaps in extraordinary circumstances, no such belief will exist on the part of a reasonably prudent officer as to danger from post-detention access to a weapon, "for it is most unlikely that a suspect would want to attack the officer who had just told him he was free to go." 4 Wayne R. LaFave, Search and Seizure § 9.5(e) at 219-92 (3d ed. 1996).
 
 
 32
 Additionally, the majority states that a person being detained in a Terry stop might "break away from police control and retrieve a weapon from his automobile." Long, 463 U.S. at 1051. Accordingly, the majority reasons that even though Slater was under the control of two police officers at the rear of his vehicle, this fact did not detract from his ability to gain access "readily" to a weapon in the vehicle. Maj.Op. at . See United States v. Paulino, 935 F.2d 739, 747 (6th Cir.1991) (holding that six police officers on scene separating suspects from cooler possibly containing weapon did not obviate need for protective search of vehicle). In my opinion, the continued reasoning of this court on immediate control of weapons lacks the support of logic. As such, "[a]lthough there is always a temptation in cases of this nature when ... drugs and firearms are found to let the end justify the means," this court should resist such temptation. Mesa, 62 F.3d at 163. In this instance, Slater would have had to go through Gronstrom to gain access to any weapon in the vehicle. Moreover, Massengill testified he would have grabbed Slater had Slater made any movement toward the car. Transcript, Feb. 11, 1994 Hearing, at 56-57. In my view, this sort of containment is not ability to gain immediate control of a weapon.
 
 
 33
 Finally, I take exception with the majority's application of the plain view doctrine as an alternative rationale in this case. Maj.Op. at . The plain view doctrine requires that observations of evidence be made from a lawful right of access reached without Fourth Amendment violation. Horton v. California, 496 U.S. 2301, 2309-10 (1990). The majority recounts the chain of events as if Gronstrom just happened to see the weapon "from the street through the open car door." Maj.Op. at . From my reading of the record, immediately after his patdown of Slater, Gronstrom announced he was going to search the vehicle and intentionally moved from the rear of the vehicle to conduct the search through the open driver-side door. J.A. at 92. Based on my finding above that no reasonable belief of danger existed in this case, Gronstrom's deliberate visual search of the floorboard area was conducted without a lawful right of access and is therefore constitutionally impermissible. Thus, the requirements of the plain view doctrine are not met here.
 
 
 34
 Based on the totality of all circumstances and viewing the record in the light most favorable to the government, I do not believe there were sufficient specific and articulable facts presented to support a finding of reasonable belief of danger and immediate control of a weapon, and, as a result, the search of Slater's vehicle was unjustified. Therefore, I dissent, echoing long-standing concerns that
 
 
 35
 [Fourth Amendment rights] are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of an individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.
 
 
 36
 Long, 463 U.S. at 1065 (Brennan, J., dissenting) (citing Brinegar v. United States, 338 U.S. 160, 180 (1949) (Jackson, J., dissenting)).
 
 
 
 *
 The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The following facts contributed to a sufficiently reasonable suspicion by Gronstrom that Slater could have been armed and dangerous: (1) Gronstrom believed he had seen Slater's vehicle before in an area of town known for drug trafficking and violence; (2) Slater pulled into a desolate parking lot slowly late at night instead of stopping right away in a well-lighted area; (3) Gronstrom observed Slater reaching into the rear seat as he came to a stop; (4) Slater appeared to be nervous and trembling; and (5) while Gronstrom was looking at his license, Slater reached down between his legs and then immediately pulled his hands up saying that he did not have anything and was not doing anything before Gronstrom could even ask about his movements
 
 
 [1]
 It is necessary that in giving "due weight" to the remainder of the majority's factors for reasonableness, the scales must include that Gronstrom mistakenly believed from his initial sighting of this vehicle that the vehicle qua vehicle was potentially dangerous before anything ever occurred with the driver