**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gerald Thomas LANE,
Defendant-Appellant.**

**No. 74–1568.**

United States Court of Appeals,
Ninth Circuit.

April 7, 1975.

---

Oliver W. Holmes, Jr., Glendale, Cal., for defendant-appellant.

Kenneth P. Snoke, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

## OPINION

Before DUNIWAY and KILKENNY, Circuit Judges, and SOLOMON,* Senior District Judge.

SOLOMON, Senior District Judge:

Gerald Lane was found guilty by a jury of conspiracy, of aiding and abetting a conspiracy by others to distribute and possess a controlled substance for distribution, and of unauthorized interception and divulgence of radio communications. He appeals from the judgment of conviction and we affirm.

In February, 1973, Lane installed a special radio in his 1972 white Ford stationwagon. The radio was able to pick up police radio calls on the Los Angeles Police Department (LAPD) "Tactical One" radio frequency.

In May, June and July, 1973, Lane used the information he obtained by monitoring the police frequency to warn drug dealers that they were being investigated or duped by the LAPD narcotics squad. The grand jury indicted Lane for warnings that took place on several different days, but he was found guilty on the basis of only one.

On July 16, 1973, the LAPD was engaged in an undercover narcotics investigation during which undercover officer Ed Gossett was directed to buy cocaine from Roger Neilsen, Kenton Albin and Wayne Hill. Gossett was assisted by Christopher Arena, an undercover civilian agent.

Gossett and Arena met Hill, Albin and Neilsen at a restaurant in Orange County, California. At about 10:00 P.M., Gossett and Arena drove with Neilsen and Albin to the Space Age Motel in Anaheim. LAPD officers followed the car and continually broadcast its route over the "Tactical One" frequency.

The four men went to a second floor room in the motel. Shortly thereafter, its telephone rang; Neilsen answered it. The caller warned Neilsen that two of the men with him were police undercover agents and that if he had any drugs in the room he should dispose of them.

Later, the telephone in the room rang again. This time Arena answered. The caller told Arena that Gossett was a policeman and that he and his associates were being set up for a "bust". Gossett's name had been mentioned over the police radio.

Hill arrived at the motel room and gave Gossett one ounce of cocaine. Shortly thereafter, a third phone call was received, this time by Hill. After this call, the three suspects—Hill, Neilsen and Albin—decided to deliver the remaining 15 ounces at Hill's residence.

Gossett and Arena both saw a man, whom they later identified as Lane, at the Space Age Motel.

* Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

Gossett and Arena accompanied the three peddlers to Hill's house, where the deal was consummated. Gossett then signaled nearby police officers and the peddlers were arrested. Later that night, Officer Robertson, who was guarding the house, saw a 1972 white Ford stationwagon pass the house several times. Robertson testified that Lane was the driver and that the passenger resembled Neil Moran, Lane's co-indictee.

At about 10:00 A.M. on the following day, Clarence Zimmerman visited the home of Neil Moran to collect a debt. Moran was awakened by Zimmerman and asked why he was still asleep. Moran said that he had been out chasing police all night. He described how he and Lane had used Lane's special radio to follow the police on narcotics investigations. He told of the incident at the Space Age Motel during which he made three warning telephone calls to the motel room.

After leaving Moran's residence, Zimmerman went to the LAPD and told the officers what Moran had told him. The officers placed a concealed transmitting device on Zimmerman. Zimmerman returned to Moran's residence and, as instructed by the police, told Moran that he knew someone who wanted Moran and Lane to cover a large marijuana sale by monitoring the police frequencies.

Moran boasted that he and Lane had saved 25 to 30 people from arrest by alerting them to police involvement. Moran described one incident in which Lane made the warning in person. Moran and Zimmerman arranged to meet Lane later that day to enable Zimmerman to see how the radio worked and to discuss the possibility of having the marijuana sale monitored. This conversation between Moran and Zimmerman was monitored and recorded by the police.

That evening, Zimmerman, wearing the concealed transmitter, returned to Moran's residence. Zimmerman and Moran went with Lane in his station-

wagon, and Lane demonstrated his radio equipment. Lane said that his radio would pick up calls by the Los Angeles narcotics squad, the FBI, and the Sheriff's department, and told about some of his warnings to drug dealers. Lane described the events of the previous night at the Space Age Motel and at Hill's residence, which description was consistent with the evidence adduced at trial.

Zimmerman told Lane that he had a friend who wanted to be covered on a sale. Lane agreed to provide that service for ten per cent of the price of the drugs. Because of technical difficulties, this conversation was not recorded.

Immediately after this conversation, Zimmerman tried to signal the police. Moran and Lane became suspicious and fled. Lane was arrested the next day. He denied having radio equipment capable of picking up police calls.

Lane gave the officers permission to search his car. The officers failed to find a radio, but they did find that the car had mounting bracket holes.

A search of Lane's residence revealed a street guide and pieces of paper which had handwritten notations by both Moran and Lane. These notations referred to several warnings, including the one at the Space Age Motel.

At the trial, Lane admitted that he had a special radio and that he demonstrated it to Zimmerman. Lane testified that he showed the radio to Zimmerman because Moran told him that Zimmerman wanted to purchase similar radio equipment through Moran. Lane also testified to an alibi for the evening of the Space Age Motel incident. Thereafter, the government was permitted to play the entire tape of the conversation between Zimmerman and Moran on the afternoon of July 17, 1973.

The jury found Lane guilty on three counts:

Count One, a conspiracy [1] whose objects were to aid and abet the possession and distribution of cocaine and marijuana,[2] to use telephones to facili-

---

1. 18 U.S.C. § 371.

2. 21 U.S.C. §§ 841(a)(1) and 846; 18 U.S.C. § 2.

tate the commission of felonies,[3] and to intercept radio communications without authorization.[4] This was by special verdict.

Count Ten, aiding and abetting a conspiracy to distribute and possess cocaine.[5]

Count Twelve, intercepting radio communications without authorization.[6]

Lane received a five-year prison term on Count One, and probation and special parole terms on Counts Ten and Twelve.

I.

Lane asserts that there was insufficient evidence to sustain his convictions.

On Count One, he argues that the statements of Moran, his alleged coconspirator, were inadmissible to prove a conspiracy because the conspiracy was not established by independent evidence. We disagree.

Lane admitted that he and Moran intercepted police radio calls on the evening of July 16, 1973. While he demonstrated his radio to Zimmerman in the presence of Moran, they heard a radio call by the LAPD narcotics squad. Lane told Zimmerman, "This is the same unit we followed last night out in Santa Ana." Later, when Lane and Zimmerman discussed the possibility that Lane might cover a marijuana sale for Zimmerman's friend, Lane said he agreed with the price of ten per cent quoted by Moran.

Additional circumstantial evidence was introduced to establish the conspiracy. Officer Robertson saw Lane and a man who resembled Moran pass the house in which the suspects were arrested. Notations about intercepted police radio calls were found in Lane's house; some of these notations were in Lane's handwriting and others were in Moran's. Lane met Zimmerman at Moran's home to demonstrate his radio, and Moran accompanied Lane when Lane and Zimmerman

discussed the proposed deal to cover the marijuana sale.

We find that there was ample evidence of a conspiracy independent of Moran's statements to Zimmerman.

On Count Ten, Lane argues that there was no evidence that he aided and abetted a conspiracy between Hill, Neilsen and Albin. He argues that there was no such conspiracy and that, even if a conspiracy were proved, there was no evidence that he knew of it or that he shared any criminal intent with the conspirators. There is no merit in this contention.

Neilsen, Gossett and Arena all testified about the actions of the three conspirators, Hill, Neilsen and Albin. The evidence showed that from monitoring the police radio frequency, Lane knew that several men and at least one police agent were negotiating a drug deal in a room at the Space Age Motel. That knowledge is sufficient to support Lane's conviction. The government is not required to show that Lane participated in all the conspiratorial acts or that he knew the names or exact number of the conspirators or the terms of the sale. United States v. Baxter, 492 F.2d 150 (9th Cir. 1973); United States v. Friedman, 445 F.2d 1076 (9th Cir. 1971), cert. denied, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275.

Lane also argues that he did not aid or abet the alleged conspiracy. He says that he actually advised against it.

Aiding and abetting, as used in 18 U.S.C. § 2, means to assist the perpetrators of a crime. United States v. Mallory, 460 F.2d 243 (10th Cir. 1972), cert. denied, 409 U.S. 870, 93 S.Ct. 197, 34 L.Ed.2d 120; United States v. Harris, 441 F.2d 1333 (10th Cir. 1971).

" . . . In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in some-

---

3. 21 U.S.C. § 843(b).

4. 47 U.S.C. § 605.

5. 21 U.S.C. § 841(b)(1); 18 U.S.C. § 2.

6. 47 U.S.C. § 605.

thing that he wishes to bring about, that he seek by his action to make it succeed.' L. Hand, J., in United States v. Peoni, 2 Cir., 100 F.2d 401, 402." Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949).

Here, Lane associated with and participated in the criminal venture by acting as a sentinel and by warning the peddlers of police activity. If Lane had been hired by the drug dealers to monitor their criminal transaction, he could not seriously contend that he was discouraging, rather than aiding and abetting, the commission of the crime. Lane's role here was functionally identical.

■ It is immaterial that he did not know all the details of the crime, Williams v. United States, 308 F.2d 664 (9th Cir. 1962), or all of the persons who were perpetrating the crime, White v. United States, 366 F.2d 474 (10th Cir. 1966). Neither is it necessary that he have an active stake in the outcome of the crime, Wyatt v. United States, 388 F.2d 395 (10th Cir. 1968), or that there was an agreement between him and the drug dealers. Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435 (1954). It is enough that he acted with criminal intent and design to assist the perpetrators of the crime. There was ample evidence of such intent and design here.

Lane's final sufficiency-of-evidence argument relates to Count Twelve and is based on a defect in the indictment. Count Twelve charges that the incident at the Space Age Motel occurred "on or about June 7, 1973." Lane argues that no evidence was presented at trial about that date. The proof at trial was that the warnings were given on July 16, 1973.

■ Lane's argument has no merit. This was not a fatal variance. The date was not a material element of the crime here and Lane does not contend that he was misled in preparing his defense. United States v. Covington, 411 F.2d 1087 (4th Cir. 1969).

## II.

Lane contends that the trial court erred in admitting in evidence the tape recording of the Moran-Zimmerman conversation.

Lane says that the tape recording of this conversation on July 18, 1973, was "so unintelligible that [it] was wholly untrustworthy."

■ A recorded conversation is generally admissible unless the unintelligible portions are so substantial that the recording as a whole is untrustworthy. Monroe v. United States, 98 U.S.App. D.C. 228, 234 F.2d 49, 55 (1956). "The admissibility of a recorded conversation is addressed to the sound discretion of the trial judge." Cape v. United States, 283 F.2d 430, 435 (9th Cir. 1960).

■ At the end of the trial, after Zimmerman and Lane had testified, the court reviewed the transcript of the recording and the recording itself. He found that some portions were inaudible and other portions unintelligible. Nevertheless, the court permitted the jury to hear the entire recording on the ground that it was admissible to corroborate Zimmerman's testimony and to impeach Lane. The court did not abuse its discretion.

## III.

■ Lane next contends that he was denied a trial by an impartial jury because sometime after the verdict of guilty had been returned, one of the jurors informed the court of an unusual incident which had occurred during the trial.

The juror reported that on a day on which the trial was recessed, she received a phone call at work one morning from a man who asked for someone who did not work there. Later that day, when she went to lunch and while in a busy intersection, a man almost ran over her with his car. She got a glimpse of the man, and he appeared to match the general description of Lane's co-indictee, Moran, who was then a fugitive. At the

trial, Lane had attempted to show that Moran was either solely responsible for the radio interceptions and warnings or that he did it with someone other than Lane.

The juror reported these incidents because she said the book of instructions to jurors contained a statement that "if something unusual or strange happens while we are on jury duty that we should tell the court." The court thanked the juror and referred the matter to the United States Attorney and to the Federal Bureau of Investigation. The juror did not represent that she had told any other juror about these occurrences and did not say that she had been influenced by them. When Lane learned of these occurrences, apparently he did not request the court to interrogate any of the jurors and did not make an effort to interrogate the jurors himself. The record is also silent on what, if anything, was learned by the United States Attorney or the Federal Bureau of Investigation.

Lane has failed to show any prejudice to him, and in our view he was not denied an impartial trial.

### IV.

■ Finally, Lane argues that he was denied a fair and speedy trial because the trial, which took only 10 trial days, was spread over a period of 26 days. This 26-day period included the court's regular Monday motion calendars as well as Saturdays, Sundays, and a holiday. It also included a one-day delay which Lane, himself, requested.

Lane says that the trial proceeded in such an intermittent fashion that the jury would be totally confused about the evidence. Lane, however, does not allege any specific ground of prejudice nor does he say how he was prejudiced. In our view, the delays did not prejudice Lane. There was no abuse of the trial court's discretion.

Lane's other arguments are frivolous.

Affirmed.