990 F.2d 1264
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Larry F. PERRIN, Defendant-Appellant.
 No. 91-30005.
 United States Court of Appeals, Ninth Circuit.
 March 29, 1993.
 
 Appeal from the United States District Court for the Western District of Washington; No. CR-89-00016-JET, Jack E. Tanner, District Judge, Presiding.
 Before WRIGHT, FLETCHER and CANBY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Larry Perrin was convicted after a jury trial of conspiring to manufacture more than 100 marijuana plants in violation of 21 U.S.C. § 846 and of the substantive offense, a violation of 21 U.S.C. § 841. He appeals his conviction and sentence.
 
 FACTS AND PROCEDURAL HISTORY
 
 3
 In March 1987, Perrin and James Varner were arrested in connection with a marijuana cultivation facility they had operated in Oregon. The two agreed to set up a similar venture somewhere else, and selected a site in Camas, Washington.
 
 
 4
 By January 1988, Perrin, Varner, Varner's wife, and Perrin's companion Judy Moll had begun cultivating marijuana on the Camas property. Perrin paid the rent and utilities for the first few months; it is somewhat unclear who paid the rent thereafter. Perrin purchased a substantial amount of equipment for the operation. He participated in the cloning of marijuana plants, some of which was accomplished at his and Moll's separate residence in Skamania. Perrin also took part in harvesting and selling the marijuana. At the outset of the operation, Perrin was at the site constantly. Later he came to the Camas site only once or twice a week.
 
 
 5
 In October 1988, Varner had a disagreement with Perrin and Moll. He contacted federal drug enforcement officials, and offered to cooperate in the investigation of the grow operation. He took the agents through the Camas site. Thereafter, the agents began surveillance of the operation. The agents did not observe Perrin at the Camas site or the Skamania house at any time. In December 1988, Perrin began living at a halfway house in Portland, Oregon, where he was serving part of his sentence for an earlier conviction for marijuana production.
 
 
 6
 On December 28, 1988, Varner had separate conversations with Moll and Perrin, which he taped. Perrin commented on the conduct of one of the "employees" at the marijuana site, and gave Varner instructions as to how to deal with the employee. Varner and Perrin also discussed electric power problems at the site, the condition of the plants, and the possibility of harvesting the plants.
 
 
 7
 In February 1989, Moll and others dismantled the Camas operation and moved it to a different location. In March 1989, Moll was arrested. The next day, Perrin failed to return to his halfway house. He was arrested in South Dakota in November 1989, and was returned to Washington.
 
 
 8
 At Perrin's trial, the jury listened to the December 28, 1988 tape of the conversations between Varner and Perrin. Perrin took the stand. Although he admitted that he and Varner had started up the Camas operation and that he had helped build the facilities there, he claimed that he had ceased participating in the operation in mid-1988, and had encouraged Moll to shut it down. Moll testified that Perrin had not participated in the cultivation of plants after mid-1988, and had informed Varner, too, that he no longer wanted to be involved. Varner, however, testified that the operation had been dismantled in February 1989 at Perrin's direction.
 
 
 9
 The jury found Perrin guilty of both conspiracy to manufacture marijuana and the substantive offense. Because he had two previous convictions for marijuana production, Perrin was sentenced to 30 years as a career offender. He appeals both his conviction and his sentence.
 
 DISCUSSION
 A. Withdrawal Instruction
 
 10
 Perrin argues that the district court committed reversible error in failing to give his requested instruction on withdrawal. The proposed instruction stated:
 
 
 11
 Once a person becomes a member of a conspiracy, that person remains a member until that person withdraws from it. One may withdraw by doing acts which are inconsistent with the purpose of the conspiracy and by making reasonable efforts to tell the coconspirators about those acts. You may consider any definite, positive step that shows that the conspirator is no longer a member of the conspiracy to be evidence of withdrawal.
 
 
 12
 The government has the burden of proving that the defendant did not withdraw from the conspiracy before the overt act--on which you all agreed--was committed by some member of the conspiracy.
 
 
 13
 The district court found that "under the facts and circumstances of this case," the instruction should not be given. (Reporter's Transcript ("R.T.") at 327.)
 
 
 14
 Perrin was charged with conspiracy to produce marijuana and with the substantive offense. Perrin's own testimony demonstrated, however, that before his alleged withdrawal, he had already committed all the acts necessary to support a conviction on the conspiracy count. See United States v. Loya, 807 F.2d 1483, 1493 (9th Cir.1987) ("When an agreement is made to accomplish an unlawful object[ive] and an overt act is taken to achieve that agreement[,] the crime of conspiracy is complete."). Thus, the evidence did not support a withdrawal defense to the conspiracy count.
 
 
 15
 Perrin urges that, even if withdrawal did not constitute a defense to the conspiracy charge, the district court should have given the instruction because a finding of withdrawal would have other important consequences for his defense. For example, statements made by his coconspirators after his withdrawal would not be admissible against him. This contention, however, also fails in view of the fact that the evidence did not support a finding that Perrin withdrew. In any event, the requested instruction did not apprise the jury of any of the evidentiary concerns now asserted by Perrin.
 
 
 16
 Finally, while Perrin could have raised a withdrawal defense to the substantive count by attempting to show at trial that he withdrew before 100 or more marijuana plants were produced, he did not do so. Notably, Varner testified that once the grow operation was underway, by January 1988, the least number of plants in cultivation at any given time was 300.
 
 
 17
 The district court did not err in refusing to give the requested instruction.
 
 B. Motion to Suppress
 
 18
 At trial, Perrin moved to suppress the fruits of the government's warrantless inspection of the Camas property, contending that the search was illegal because Varner was in effect a government agent as a result of his agreement to cooperate and the government's reimbursement of his moving expenses.
 
 
 19
 This court has "left open the question of whether the existence of authority to consent is reviewed de novo or for clear error." United States v. Kelley, 953 F.2d 562, 566 (9th Cir.1992). Because the issue of whether Varner's cooperation with the government prevented him from giving valid consent to a search of property over which he had joint control is a legal one, we review the district court's determination de novo.[1]
 
 
 20
 We begin by noting that Varner's role was that of an informant rather than an agent. Varner approached the government, not vice versa. The fact that the government compensated him for his moving expenses was not sufficient to establish an agency relationship. See United States v. Busby, 780 F.2d 804, 807 (9th Cir.1986) (fact that informant expected to be paid for information did not render him a government agent).
 
 
 21
 In defending the legality of the search, the government relies on case law which holds that a defendant's Fourth Amendment rights are not violated when he makes incriminating statements to someone who, unbeknownst to him, is a government informant. Hoffa v. United States, 385 U.S. 293, 302 (1966) (Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it"); see also Smith v. Maryland, 442 U.S. 735 (1979) (defendant had no legitimate expectation of privacy in the numbers he dialed from his home telephone, which were monitored by the telephone company and turned over to the police). Perrin suggests that these cases are inapposite because they do not address the Fourth Amendment's greater protection of an individual's privacy interest in his property. We disagree with Perrin, and find the government's reasoning persuasive.
 
 
 22
 Hoffa and Smith stand for the proposition that a wrongdoer runs a certain risk when he voluntarily shares information with a third party that that party may disclose it to the government. In this case, Perrin took a similar risk when he entered into joint control with Varner of the marijuana grow operation at the Camas property. There is no Fourth Amendment guarantee that one's partner in crime will not reveal evidence of the crime to law enforcement authorities.
 
 
 23
 The Fourth Amendment's higher protection against unreasonable property searches does play a role here; only a third party with common authority over the subject property could give valid consent to a search. Perrin concedes that Varner possessed such authority. The fact that he was also an informant did not destroy it.
 
 
 24
 C. Admission of the Tape Recording and Use of Transcript
 
 
 25
 At trial, the jury listened to the tape recording of Varner's conversation with Perrin. The government prepared a transcript to assist the jury as it listened to the tape. Perrin, asserting that certain portions of the tape were inaudible, objects both to the admission of the tape and the use of the transcript.
 
 
 26
 Because Perrin's counsel expressly consented to the playing of the recording, we review its admission for plain error. United States v. Houser, 804 F.2d 565, 570 (9th Cir.1986).
 
 
 27
 "A recorded conversation is generally admissible unless the unintelligible portions are so substantial that the recording as a whole is untrustworthy." United States v. Lane, 514 F.2d 22, 27 (9th Cir.1975). As nothing in the record suggests that the tape recording contained so many defects that it was unreliable "as a whole," the district court did not err in admitting the recording.
 
 
 28
 Defense counsel did object to providing the transcript of the tape to the jury, and specifically objected that one portion of the conversation between Varner and Perrin was inaccurately transcribed. The government agreed to redact the transcript to meet the specific objection. Neither the tape nor the transcript was sent to the jury room. We review for abuse of discretion the court's permission to provide the redacted transcript to the jury as a listening aid. United States v. Booker, 952 F.2d 247, 249 (9th Cir.1991).
 
 
 29
 This court has held that a government-prepared transcript may be used by the jury to follow a tape recording where the district judge reviews the transcript for accuracy, the agent who participated in the taped conversation testifies to its accuracy, and the district judge gives the jury a limiting instruction. Id.
 
 
 30
 Here, both Varner and the government's case agent testified that the transcript was accurate. Before the tape was played, the court instructed the jury that the transcript was not evidence, but merely an aid to listening. Although the district court did not review the transcript, the one specific inaccuracy objected to by defense counsel was cured when the government redacted the transcript. We note that even though he had ample opportunity to do so, defense counsel did not prepare his own transcript of the recording. Under these circumstances, the district court did not abuse its discretion in permitting the jury to use the transcript in question. Cf. id. at 250 (use of transcript upheld even though district court did not review it).
 
 D. Sentencing Issues
 
 31
 Perrin's first challenge to his sentence is that the district court failed to make an adequate factual finding as to whether he withdrew from the marijuana production scheme. He argues that because the Sentencing Guidelines were amended in November 1988 to impose harsher sentences, a finding that he withdrew in mid-1988, as he claims, would result in a lower sentence.
 
 
 32
 The district court adopted the findings of the presentence report "insofar as necessary" to support the sentencing recommendations of the report. (Excerpts of Record at 76.) The calculations in the report were premised upon Perrin's having been an active participant in the conspiracy until it ended. Perrin did not object to this aspect of the presentence report at the sentencing hearing. We therefore review this first sentencing issue for plain error. United States v. Koenig, 952 F.2d 267, 272 (9th Cir.1991); see also United States v. Visman, 919 F.2d 1390, 1393-94 (9th Cir.1990) (defendant's failure to object to accuracy of presentence report at sentencing hearing constituted waiver), cert. denied, 112 S.Ct. 442 (1991).
 
 
 33
 Perrin's contention lacks merit. During trial, the district court ruled that Perrin's alleged withdrawal was not supported by the evidence. Even if Perrin had objected to the report at the hearing, the district court would have satisfied its obligation under Fed.R.Crim.P. 32 when it adopted the factual findings of the report. United States v. Rosales, 917 F.2d 1220, 1222 (9th Cir.1990). The court's failure to make a specific finding on this issue at sentencing did not constitute plain error.
 
 
 34
 Next, Perrin contends that the district court erred in failing to recognize that it had the discretion to depart downward from the career offender provisions under which Perrin was sentenced. Perrin requested such a downward departure on the ground that the applicable sentencing range overrepresented the seriousness of his previous criminal activity. See United States v. Lawrence, 916 F.2d 553, 554-55 (9th Cir.1990) (court may depart downward from career offender provisions where it finds that the defendant's criminal history category overrepresents the seriousness of his criminal record).
 
 
 35
 Ordinarily, a district court's refusal to depart downward is not reviewable. United States v. Sanchez, 914 F.2d 1355, 1363 (9th Cir.1990), cert. denied, 111 S.Ct. 1626 (1991). This court will review the district court's refusal to depart, however, if that refusal is based on the belief that the court has no discretion to depart. United States v. Mejia, 953 F.2d 461, 464-65 (9th Cir.1991), cert. denied, 112 S.Ct. 1983 (1992).
 
 
 36
 A review of the sentencing transcript reveals that the court refused to depart downward not because it believed it had no discretion, but because it rejected Perrin's argument that he deserved a lighter sentence. Perrin's counsel repeatedly cited the Lawrence case, which authorizes such a departure, during the colloquy on the issue; the government did not argue that the court had no discretion to depart, but rather that departure was not warranted. The court acknowledged that the defendant was "asking [it] to use some basis to go outside the guidelines," but later concluded that "he has those three convictions, and he's solidly within the career-offender provisions we're talking about. I don't see any reason to go outside of them." (R.T. of Sentencing Hearing at 38-39.) Judge Tanner was particularly concerned that Perrin had "challenged the whole justice system" by continuing to run a marijuana cultivation operation even while on probation for a previous drug offense. (Id. at 21.) The judge explained that "there had to be a reason" to depart and that he was "hard pressed to find that reason." (Id. at 40.)
 
 
 37
 In support of his position, Perrin points to a number of statements made by the court during the course of this discussion to the effect that "Congress took that independent determination away from the United States District Court Judges by passing of the guidelines." (Id. at 22.) Taken in context, however, these comments were not references to an inability to depart, but responses to defense counsel's zealously presented argument that the structure of the career offender provisions promotes rather than eliminates disparities in sentencing.
 
 
 38
 We conclude that the district court was well aware of its discretion under the guidelines, but did not believe the circumstances warranted a departure.
 
 
 39
 The conviction and sentence are AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 We assume without deciding that Perrin has standing to challenge the search as a cotenant of the Camas property