105 F.3d 667
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ricardo MENDOZA-CASTREJON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Abel PENA-CASTREJON, Defendant-Appellant.
 Nos. 95-50586, 96-50001.
 United States Court of Appeals, Ninth Circuit.
 Submitted Dec. 13, 1996.*
Decided Jan. 7, 1997.
 
 Before: PREGERSON, D W NELSON, and O'SCANNLAIN, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Appellants Abel Pena-Castrejon ("Abel Pena") and Ricardo Mendoza-Castrejon ("Mendoza") appeal their convictions following a jury trial, for conspiracy to distribute heroin (21 U.S.C. §§ 846, 841(a)(1)) and possession with intent to distribute heroin (21 U.S.C. § 841(a)(1)). We have jurisdiction under 28 U.S.C. § 1291. We affirm.
 
 BACKGROUND
 A. The Underlying Crimes
 
 3
 The Government obtained its evidence against appellants by way of an undercover operation centered around Freddy Vegas Alarcon ("Vegas"), who worked as a paid informant for the Government. Vegas first met Abel Pena-Castrejon ("Abel Pena") in connection with an attempt to purchase ten kilograms of heroin. SER at 246-48.[1] Subsequently, Vegas had several meetings with Abel Pena and Abel Pena's brother, Ricardo Mendoza ("Mendoza"). Id. at 250-53. Vegas obtained a sample of heroin from Abel Pena for the purpose of mailing it to Vegas's fictional boss. Id. at 255-59.
 
 
 4
 Between December 9, 1994 and February 3, 1995, Vegas had numerous telephone conversations with Abel Pena and Mendoza about the proposed heroin purchase. Id. at 262. On December 20, 1994, Abel Pena informed Vegas that he and Mendoza would be selling three kilograms of heroin to him. Id. at 280-81.[2]
 
 
 5
 To further the proposed drug transaction, Vegas sent $2000 to Abel Pena on December 21, 1994. Id. at 285. On February 2, 1995, Vegas also sent $1000 worth of Mexican pesos to Abel Pena's brother, Rafael Pena-Castrejon. Id. at 285-88.
 
 
 6
 On February 3, 1995, Abel Pena called Vegas from Tijuana, Mexico. He requested that Vegas give him a ride across the border so that they could meet. At the meeting, Abel Pena requested money from Vegas to pay for "protection" for the three-kilogram heroin delivery. In compliance with this request, Vegas gave Abel Pena $9500. Id. at 289-90.
 
 
 7
 On February 6, 1995, Vegas and Abel Pena once again met to discuss the particulars of the proposed heroin transaction, including crossing the border and packaging the heroin. The delivery was scheduled for February 7, 1995. Id. On February 7, Vegas went to Solar Pescar (P.H.), Mexico to meet Abel Pena and accompany him across the border. The two of them were to transport the heroin in a Red Renault. Id. at 292. After arriving in Mexico, however, Mendoza informed Vegas that Abel Pena had decided to cross the U.S.-Mexico border alone. Id. at 292-93. Government agents arrested Abel Pena after he crossed the border and confiscated the heroin.
 
 
 8
 Later that day, Mendoza called Vegas to discover the fate of Abel Pena. Assuring him that things were fine, Vegas offered to bring Mendoza into the United States to attend a party celebrating the heroin transaction. Mendoza accepted the offer. Id. at 293-95. During the car trip, Government agents recorded the conversation between Vegas and Mendoza. Id. at 295.[3] During this conversation, Mendoza discussed several issues with Vegas concerning the method of transporting heroin and future heroin transactions. Mendoza commented on the use of mustard in packaging heroin, id. at 297; on using the Nuevo Laredo-Laredo border as a point of entry in future heroin shipments, id. at 298; on transporting five more kilograms of heroin to Vegas in the future, id. at 299; and on the manner of transport for future shipments, id. at 301.
 
 
 9
 Government agents arrested Mendoza upon his arrival in the United States.
 
 B. Interrogation of Mendoza
 
 10
 U.S. Customs Service Agent Elisha Fuentes and Agent Kenneth Davis of the Drug Enforcement Agency ("DEA") interrogated Mendoza within an hour of his arrest. SER at 35-36, 70. Fuentes, who spoke fluent Spanish, served as the interpreter for Davis during the interview. Id. at 68-69.[4] At no time during this questioning did the Government agents ever advise Mendoza of his Miranda rights. Id. at 67.
 
 C. Pre-Trial Motions
 
 11
 Mendoza moved to exclude the statements he made to Government agents during his interrogation on the grounds that he made those admissions before receiving his Miranda warning. The Government conceded that it could not use the statements in its case-in-chief. However, the Government sought a ruling from the district court to allow the use of Mendoza's admissions for purposes of impeachment. The district court granted the Government's request. Id. at 85.
 
 
 12
 None of Mendoza's admissions were introduced as evidence at trial.
 
 
 13
 In a separate motion, Abel Pena moved to exclude the tape recording of the February 7, 1995 conversation between Mendoza and Vegas. The Government opposed the motion, stating that the conversation was admissible against Abel Pena since it was made in furtherance of a criminal conspiracy. Abel Pena disagreed, asserting that any conspiracy was impossible because Mendoza and his other coconspirators had already been arrested. The trial court denied Abel Pena's motion, ruling that the conversation was admissible because it was made in furtherance of the conspiracy. ER at 7-14.
 
 
 14
 In a separate motion, the trial court granted a defense request for funds to translate and transcribe all the audio tapes of conversations between appellants and Vegas. Id. at 5-7.
 
 
 15
 Appellants also requested access to Vegas's previous testimony in grand jury proceedings in all other unrelated cases. The Government represented to the district court that no such testimony existed. Id. at 430.
 
 D. Alleged Juror Misconduct
 
 16
 During jury selection, the trial court asked all prospective jurors if they had any relatives involved in law enforcement. Juror Otilio Perez incorrectly testified that he was not related to anyone who worked in law enforcement. In reality, Otilio Perez had a distant relative who was an Assistant U.S. Attorney ("AUSA") in the same office as the AUSA who was prosecuting the trial.[5] During the time of the trial, Otilio Perez briefly conversed with his relative in the cafeteria in the courthouse, but they did not discuss the case.
 
 
 17
 At a later evidentiary hearing, Otilio Perez explained that while he knew his relative was an attorney, he did not know he was an AUSA. SAER at 8-10. Nor did he consider attorneys to be members of law enforcement. He thought that law enforcement only included working for a "police department or something like that." Id. at 10. Otilio Perez stated he answered the trial court's voir dire questions honestly. Id. at 11.
 
 
 18
 On the basis of Otilio Perez's failure to disclose his connection to the U.S. Attorney's office during voir dire, defendants moved for a mistrial. The district court denied the motion on the grounds that Otilio Perez had a "good faith belief" that he was answering the trial court's questions truthfully. Id. at 18-19.
 
 E. Admission of the Audiotapes at Trial
 
 19
 The Government agents taped many of the conversations held between Vegas and appellants. SER at 217. Many of the conversations were held in Spanish. Id. Agent Fuentes, a native speaker of Spanish who used that language on a regular basis in her work, monitored the tape recording operation.
 
 
 20
 In preparing the transcriptions of the tapes, a translator first transcribed the tape. Fuentes then listened to the tape and made changes to the transcript as she saw fit. Id. at 219; SAER at 28.
 
 
 21
 Testifying specifically about the February 7, 1995 taped conversation between Vegas and Mendoza, Fuentes testified that three to five percent of the tape was inaudible. SER at 226-27. Fuentes also stated that the translation was a fair and accurate representation of the clearly audible portions of the Spanish conversations recorded in the tape. Id. at 233. The trial court denied all defense objections at trial to exclude the tapes and the transcriptions, holding that the tapes were sufficiently audible and the translations sufficiently competent.
 
 DISCUSSION
 A. Mendoza's February 7, 1995 Statements
 
 22
 We review the district court's decision to admit co-conspirator statements for an abuse of discretion. U.S. v. Segura-Gallegos, 41 F.3d 1266, 1271 (9th Cir.1994). "Generally, a district court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the facts." United States v. Rahm, 993 F.2d 1405, 1410 (9th Cir.1993).
 
 
 23
 Abel Pena asserts that the trial court committed reversible error by allowing admission of the February 7, 1995 tape-recorded statements Mendoza made to Vegas. The statements were admitted as a coconspirator admission under F.R.Evid. 801(d)(2)(E). Rule 801(d)(2)(E) provides that a statement is not hearsay if it is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." It is clear that the trial court did not abuse its discretion in holding that Mendoza's statements were made during the course and in furtherance of a conspiracy to sell and distribute heroin. The evidence is overwhelming on this point.
 
 
 24
 Abel Pena makes two arguments in support of the view that the trial court committed error in allowing admission of the statements. He first contends that the tapes could not have furthered the conspiracy since they were only "[n]arrative declarations and casual admissions of culpability." Abel Pena's Brief at 8. This description of the tape is a mischaracterization.
 
 
 25
 In Mendoza's January 17, 1995 conversation with Vegas, he talked about future heroin shipments; different overland routes to transport heroin; the advantages of using mustard in the transport of heroin; etc. This exchange of information, in the context of the relationship between Mendoza and Vegas, advanced the overall goal of the criminal conspiracy to establish a long-running and sophisticated heroin-smuggling operation.
 
 
 26
 Abel Pena also contends that admitting the statements pursuant to F.R.Evid. 801(d)(2)(E) was error since no conspiracy existed after his coconspirators were arrested. The Ninth Circuit has held, however, that a coconspirator's statement is admissible against another coconspirator who has already been arrested. U.S. v. Taylor, 802 F.2d 1108, 1117 (9th Cir.1986), cert. denied, 479 U.S. 1094 (1987); U.S. v. Saavedra, 684 F.2d 1293, 1298 (9th Cir.1982).
 
 
 27
 The district court did not commit error by admitting into evidence against Abel Pena the February 17, 1995 tape recorded statement of Mendoza.
 
 B. Juror Misconduct
 
 28
 We review the denial of a motion for a new trial for abuse of discretion. U.S. v. Aguon, 851 F.2d 1158, 1170 (9th Cir.1988) (en banc), overruled on other grounds, Evans v. U.S., 504 U.S. 255, 112 S.Ct. 1881 (1992).
 
 
 29
 [T]o obtain a new trial [because a prospective juror failed appropriately to answer a voir dire question], a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.
 
 
 30
 U.S. v. Edmond, 43 F.3d 472, 473 (9th Cir.1994) (quoting McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556, 104 S.Ct. 845, 850 (1984)).
 
 
 31
 The examination of Otilio Perez revealed no evidence that he dishonestly failed to reveal that he had a distant relative who was connected to law enforcement as an AUSA. Rather, he simply did not know his relative was an AUSA and did not consider an AUSA to be a member of law enforcement. Under these circumstances, it was not an abuse of discretion for the trial court to deny the motion for a mistrial based on Otilio Perez's failure to disclose his familial connection to an AUSA. See U.S. v. Shaoul, 41 F.3d 811, 816 (2d Cir.1994) (trial court's denial of motion for mistrial affirmed since good-faith failure by juror to reveal that his nephew-in-law was an AUSA meant that first prong of McDonough test could not be met).[6]
 
 C. Coercion of Mendoza's Statement
 
 32
 Appellants contend that the trial court erroneously allowed the Government agents "to testify as to the statements made by [Mendoza] and their observations during [Mendoza's] interrogation." Mendoza's Brief at 11 (arguing that Government agents violated Miranda ). The Government did not use these statements during its case-in-chief. Therefore, Miranda does not apply. However, before the Government may use such statements to impeach a defendant, those statements must meet the due process standard of voluntariness. See Harris v. New York, 401 U.S. 222 (1971). Mendoza is permitted to raise his due process claim despite the fact that he never testified and that, accordingly, the statements were never introduced for impeachment purposes. See United States v. Chischilly, 30 F.3d 1144 (9th Cir.1994) (defendant could raise due process claim even though he did not present an insanity defense and the Government never used an allegedly involuntary confession against defendant), cert. denied, 115 S.Ct. 946 (1995). Nevertheless, Mendoza's claim fails on the merits because testimony at trial indicates that his statements were not coerced and were offered voluntarily.
 
 D. Admission of the Audio Tapes
 1. Accuracy
 
 33
 A district court's decision to admit into evidence English language transcripts of translated conversations is reviewed for abuse of discretion where there is no dispute as to accuracy. U.S. v. Pena-Espinoza, 47 F.3d 356, 359 (9th Cir.1995). If a defendant questions the accuracy of a translated transcript, but has had an ample opportunity to investigate the transcript and to cross-examine those parties responsible for the translation--yet fails to present a showing of substantial inaccuracy--we still review for abuse of discretion. See, e.g., id. at 359-60.
 
 
 34
 Appellants only make conclusory allegations about the inaccuracy of the transcripts. Appellants received funding from the trial court to translate the audiotapes for use at trial. They also had an opportunity to cross-examine Agent Fuentes and Vegas, the two individuals who authenticated the contents of the various tapes at trial. However, they failed to make any showing, either at trial or on this appeal, that the translations were inaccurate. The district court did not abuse its discretion by admitting the transcripts into evidence.
 
 2. Audibility
 
 35
 "A recorded conversation is generally admissible unless the unintelligible portions are so substantial that the recording as a whole is untrustworthy." U.S. v. Lane, 514 F.2d 22, 27 (9th Cir.1975). A district court's decision to admit a tape recorded conversation is reviewed for abuse of discretion. Id.
 
 
 36
 Appellants make no showing that the unintelligible portions of any of the tapes admitted at trial were substantial. The district court did not abuse its discretion in admitting the tapes into evidence.
 
 E. Vegas's Grand Jury Testimony
 
 37
 Appellants contend that the trial court erroneously failed to order the Government to turn over grand jury testimony that Vegas gave in other unrelated cases. The Government, however, represented to the trial court that no such testimony existed. Thus, the trial court could not have committed error in failing to order the Government to produce nonexistent testimony.
 
 
 38
 Affirmed.
 
 
 
 *
 The panel unanimously found this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 For the sake of brevity, we leave out a description of all the co-conspirators involved in the crimes. We also do not summarize all the incriminating conversations between Vegas and appellants
 
 
 [2]
 The Government introduced the tape recording and transcription of the conversation as Exhibits 3 and 3-A. Vegas authenticated the exhibits
 
 
 [3]
 The Government introduced the tape recording and transcription of the conversation as Exhibits 6 and 6-A. Vegas authenticated the exhibits
 
 
 [4]
 Although not certified as a translator, Agent Fuentes's native tongue was Spanish and she studied it in college. Appellant's SER at 68
 
 
 [5]
 The relative was the son of Otilio Perez's nephew
 
 
 [6]
 Appellants also argue that Otilio Perez is so closely connected to his relative (and the U.S. Attorney's Office) that we should presume Otilio Perez was biased. We have cautioned against "formulating categories of relationships which bar jurors from serving in certain types of trials." Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir.1990), cert. denied, 498 U.S. 1091 (1991). Clearly, being distantly related to an AUSA is no reason to bar a person from ever serving on a criminal jury in a federal trial. See Shaoul, 41 F.3d at 816